**Opinion on rehearing issued October 24, 2013.**



In The

# Court of Appeals

For The

## First District of Texas

——————————

### NO. 01-12-00581-CV

——————————

**NEWSPAPER HOLDINGS, INC., INTEGRACARE OF TEXAS, LLC, AND CHARLOTTE PATTERSON, Appellants**

**V.**

**CRAZY HOTEL ASSISTED LIVING, LTD., CRAZY HOTEL ASSISTED LIVING, GP, LLC, LEISURE LIFE SENIOR APARTMENT HOUSING II, LTD., AND CHARLES V. MILLER, JR., Appellees**

---

**On Appeal from the 234th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-74615**

---

**O P I N I O N**

This defamation case arises from a series of articles published in the Mineral

Wells Index (the Index), a newspaper owned by Newspaper Holdings, Inc. (NHI).

The articles reported regulatory compliance problems and official investigations into the Crazy Water Retirement Hotel, a local Mineral Wells assisted living facility, and examined the conduct of Charles Miller, president of the Hotel's corporate owner.[1]  Charlotte Patterson, the Chief Compliance Officer of IntegraCare, a home health and hospice agency, was a source for some of the information contained in some of the articles.  She contacted the newspaper after she learned that Miller had attempted to bar the Hotel's residents from using IntegraCare for their home health care.

The Hotel and Miller sued Patterson, IntegraCare, and NHI ("the newspaper defendants") for defamation, business disparagement, and tortious interference with contract.  The Hotel alleged that NHI, and in some instances, Patterson, who was a managerial employee of IntegraCare, published false and defamatory statements about Miller and the Hotel and interfered with the Hotel's contractual relationships with its residents.  Patterson, IntegraCare, and NHI responded to the suit by moving to dismiss it under the newly-enacted Texas Citizens' Participation Act (TCPA).  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–27.011 (West Supp. 2012).  The trial court denied the motion.

---

[1]     Appellees Crazy Hotel Assisted Living, Ltd., Crazy Hotel Assisted Living, GP, and Leisure Life Senior Apartment Housing II, Ltd. did business as the Crazy Water Retirement Hotel, and we collectively refer to them as the Hotel.

2

NHI, IntegraCare, and Patterson appeal, contending that they have met the requirements for dismissal under the TCPA—namely, that they have showed that the allegedly defamatory statements constitute the exercise of protected free speech, and that the Hotel and Miller have failed to make a prima facie case for each of their claims. IntegraCare and Patterson also claim that Miller and the Hotel failed to provide any evidence that the published statements were false or made with negligence or actual malice, or that Miller and the Hotel incurred damages as a result of the challenged publications. For their part, Miller and the Hotel respond that we lack jurisdiction to consider the appeal. . We grant rehearing, withdraw our earlier opinion, and issue this one in its stead. We vacate our earlier judgment. Our disposition remains unchanged. We hold that we have appellate jurisdiction, and we reverse.

**Background**

*Events leading to suit*

From 2010 through 2011, the Index published articles about problems encountered at the Hotel. In an end-of-the-year article reviewing its major stories in 2010, it summarized the articles as follows:

> Month after month in 2010 complaints from residents and employees at the Crazy Water Retirement Hotel kept city and state inspectors returning to the building, investigating complaints of unsafe conditions, building disrepair, failure to provide services and verbal abuse of residents.

3

After going without air conditioning, hot water and gas to cook food and dry clothes for days at a time in August, residents of the Crazy Water Retirement Hotel had significant amounts of water come through the ceilings during the first week of September after a roofing job was left incomplete for several weeks.

As the roof remained unrepaired into September, the Department of Aging and Disability Services pulled the facility's assisted living license and attempted to close that portion of the facility.

However as residents were fed in the lobby of the building because of rainwater coming through the dining room ceiling that weekend, owner Charles Miller was granted a temporary restraining order against the case by a judge in Austin which essentially nullified any [e]ffect of license suspension.

A nurse in the assisted-living portion of the building was also accused of verbal abuse of a resident and was terminated.

State investigators cited a myriad of problems throughout the building and its management.

Though the roofing work was completed in October, the state and the city continued to respond to complaints at the facility through December.

In the first half of 2011, the Index also reported on

- the Hotel's five-month lapse in payment of its water bill, which put it on the verge of having the water turned off;

- Miller's negotiations with the city of Mineral Wells to pay the past due water bill;

- the Hotel's failure to fully meet its negotiated payment obligations to the city in a timely manner;

- Texas Department of Adult and Disabled Services' investigations, which revealed licensing violations stemming from uncorrected problems with the physical plant; and

4

- the Hotel's hiring of a management company to rehabilitate the Hotel and that company's decision to sever its ties with the Hotel just a few months later due to delays and paperwork problems in connection with the Hotel's state license application.

In early August 2011, Miller authored a letter to the Hotel's residents informing them that the Hotel would no longer allow IntegraCare home health or hospice workers into the building. The letter advised patients that they were limited to choosing between two other service providers: Health Care Partners at Home or Beyond Faith. A resident who was an IntegraCare patient called Patterson to complain about the Hotel's decision. Patterson contacted Miller in an attempt to resolve the issue. They quickly reached an impasse, so Patterson called the county district attorney, the Texas Department of Aging and Disability Services, and the Mineral Wells city manager to inform them of the Hotel's actions.

The Index named Patterson as a source for its next article about the Hotel, entitled, "Miller target of fraud probe," which it published on August 31. The Hotel and Miller's original petition focuses on that article, which we reproduce below in its entirety:

> District Attorney Mike Burns said Tuesday he will be meeting with investigators from the State Attorney General's office concerning an investigation into the Crazy Water Retirement Hotel and its owner, Charles Miller.
>
> "Their Medicaid Fraud unit is opening a case on it," he said.

5

Burns said his office has been in contact with the AG's office, though he did not provide specific details discussed in their correspondence.

Thomas Kelley with the Texas AG's press office said in an e-mail, "We can only confirm that this is an ongoing investigation."

"I should hear from them and have a meeting with them in a few days," Burns noted, adding the investigation was in its infancy and a decision on what, if any, future action will be taken against Miller will likely not be made anytime soon.

While Burns did not elaborate on the scope of this case, the DA's office has been busy over the past few weeks investigating the legality of demands made by Miller that residents of the Crazy Water choose one of two preferred home health providers.

The first such letter, sent to residents Aug. 5, listed the two remaining choices for home health care, specifically stating the facility would "no longer be allowing IntegraCare Home Health or Hospice in our building."

When IntegraCare's chief corporate compliance officer, Charlotte Patterson, contacted Burns, the threat of a grand jury subpoena from the DA's office reportedly led to Miller's decision to rescind that demand, Patterson noted.

At that time, Patterson said her concern was that Miller would try to achieve the same result by including the home health care restrictions in a future lease agreement, citing a statement in Miller's rescission letter stipulating residents can retain their current provider "under your current lease."

Her fears were realized when, about two weeks later, Miller sent residents a subsequent letter informing those unwilling to choose one of the two preferred providers to "consider this letter to you to be Crazy Water's advance written notice of its intent to terminate your current agreement effective September 30, 2011."

While the letter refers to lease terms allowing either the hotel or its residents to "terminate the agreement, without cause, by giving written notice to the other party 30 days in advance of the effective termination date" Burns confirmed he is currently investigating whether the eviction notice is in violation of any law.

Also included in the eviction notice was a section informing residents that today is the last day the hotel will operate as a licensed assisted-living facility.

In response to the latest development, Patterson said IntegraCare has not been made aware of the details of the case but, as with any investigation, is willing to assist in any way possible.

"I've been told that they might contact us for information or statements," she said, "but that has not occurred yet."

Patterson said this case involves a number of possible areas of focus for prosecutors, such as "varying issues of patient choice and, I think, the question of elderly abuse."

In the meantime, she said, IntegraCare employees remain dedicated to assisting Crazy Water residents however they can, as evidenced on Aug. 22, when three workers volunteered their time to assist two residents in their move to a facility in Jacksboro.

"On our own, [IntegraCare is] continuing to try to find alternative living arrangements" for residents of the hotel, Patterson noted.

Neither Miller nor Crazy Water manager Juan Guardado returned numerous calls and e-mails requesting a comment.

After Miller learned that the district attorney planned to embark on an investigation, the Hotel reversed its earlier position with respect to visits from IntegraCare. In an August 12, 2011 letter to residents, Miller rescinded the earlier limitation on providers and informed the residents that the Hotel would allow their health care provider of choice, including IntegraCare, into the building.

On August 18, however, the Hotel reverted to its original stance. Miller notified the residents who continued to receive services from IntegraCare that the Hotel intended to terminate their leases effective September 30, after which they

7

would have the option either to sign new leases restricting their choice of home health care providers to one of the two approved providers or to vacate their apartment by October 1. The Index reported these developments in an August 14, 2011 article:

> Mineral Wells Police Chief Mike McAllester said he was contacted by an IntegraCare representative questioning whether Miller's action [in restricting home health care providers] was legal. After discussing details, McAllester said the department's position was that a property owner cannot restrict who renters allow in their residences.
>
> He contacted the district attorney, who reportedly agreed and began an investigation into the matter.

On September 9, the Index reported that the district attorney "previously stated he met with investigators from the state Attorney General's office concerning an investigation into Miller and the hotel," and that "their Medicaid fraud unit is opening a case on it." A reporter from the Index contacted the attorney general's office and received confirmation that it had an ongoing investigation into the Hotel, but no further comment. The newspaper contacted Miller for his response, and he gave "no comment."

In January 2012, the Attorney General applied for a temporary restraining order "to gain access to [the Hotel] . . . for the purpose of conducting an investigation to determine whether the facility is operating as an unlicensed assisted living facility and to determine whether any resident neglect has occurred in violation of Chapter 247 of the Texas Health and Safety Code." The application

8

alleged that the Texas Department of Aging and Disability Services (DADS) received a complaint in September 2011 that the Hotel was being operated as an unlicensed assisted living facility in violation of state law and, when the DADS sent an investigator to the Hotel, the facility staff denied her entry. An affidavit from the investigator supported these allegations.

### *Trial court proceedings*

The Hotel and Miller instituted this suit in late 2011, bringing claims for defamation, business disparagement, and tortious interference against the defendants. Patterson and IntegraCare moved to dismiss the claim in mid-March 2012, and, in a separate motion filed a few days later, NHI also sought dismissal. Both motions invoke the parties' free speech rights under the TCPA as grounds for dismissal.

The trial court held a hearing on April 16th. At that hearing, plaintiffs' counsel moved to withdraw from representation. The trial court acknowledged that, "for purposes of the statute[,] . . . the hearing has already started," but it granted a continuance to allow the Hotel and Miller time to obtain new counsel. The trial court resumed the hearing on May 29th, more than 30 days later, and signed an order denying the newspaper defendants' motions to dismiss on May 30th.

9

**Discussion**

## I. Appellate Jurisdiction

As a threshold matter, we address Miller and the Hotel's motion to dismiss this appeal for lack of jurisdiction. Section 27.008 of the Civil Practice in Remedies Code, entitled "Appeal," provides:

(a) If a court does not rule on a motion to dismiss under Section 27.003 in the time prescribed by Section 27.005, the motion is considered to have been denied by operation of law and the moving party may appeal.

(b) An appellate court shall expedite an appeal or other writ, whether interlocutory or not, from a trial court order on a motion to dismiss a legal action under Section 27.003 or from a trial court's failure to rule on that motion in the time prescribed by Section 27.005.

(c) An appeal or other writ under this section must be filed on or before the 60th day after the date the trial court's order is signed or the time prescribed by Section 27.005 expires, as applicable.

TEX. CIV. PRAC. & REM. CODE ANN. § 27.008.

The TCPA sets strict deadlines for filing, hearing, and ruling on a motion to dismiss. Absent a showing of good cause, the defendant must move to dismiss pursuant to the TCPA "not later than the 60th day after the date of service of the legal action." TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(b). A hearing on the motion must occur by the 30th day after the date the defendant serves the motion, and the trial court must rule on the motion by the 30th day after the hearing. *Id.* §§ 27.004, 27.005(a).

10

Miller and the Hotel rely on the Fort Worth Court of Appeals's recent decision in *Jennings v. Wallbuilders Presentations, Inc.* to contend that the TCPA does not authorize an interlocutory appeal of a trial court's signed order denying a motion to dismiss under the TCPA. 378 S.W.3d 519 (Tex. App.—Fort Worth 2012, no pet.). The *Jennings* court held that the language in the TCPA conferred jurisdiction to review a decision under the TCPA, but only if the motion is denied by operation of law, and not if the trial court signs an order denying the motion. *Id.* at 526–28. The Fort Worth Court of Appeals reasoned that the legislature intended to ensure that a court would review and rule on the motion, but not that its ruling would be subject to appellate review. *See id.* at 527.

We need not decide whether we agree with the Fort Worth Court of Appeals' interpretation of section 27.008, because the trial court in this case signed its order denying the motion too late—the defendants' motions to dismiss were overruled by operation of law. The statute allows a trial court to hear a motion more than thirty days after the filing date of the motion to dismiss, but only when its docket conditions require it. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.004 (declaring that "[a] hearing on a motion [to dismiss] must be set not later than the 30th day after the date of service of the motion unless the docket conditions of the court require a later hearing."). In this case, the trial court continued the hearing solely at Miller and the Hotel's request, but it made no finding that the docket

11

conditions of the court required a hearing outside the thirty days. Because the statute does not authorize a continuance of the hearing based solely on a party's request, the continuance did not stop the statutory-deadline clock; thus, the motions were denied by operation of law on May 16, 2012, thirty days after the initial hearing. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.005 (ruling required "not later than the 30th day following the date of the hearing on the motion"); 27.008(a), (c) (providing that if court does not rule on motion to dismiss under TCPA by 30th day after hearing, motion "is considered to have been denied by operation of law and the moving party may appeal" "on or before the 60th day after the date . . . the time prescribed by Section 27.005 expires"). Patterson, IntegraCare, and NHI timely filed their notices of appeal on June 19th. Because the trial court issued its ruling more than thirty days after hearing the motion, we hold that we have jurisdiction over this appeal.

## II. *Standard of review*

We consider the TCPA's language and purpose in determining the applicable standard of review. In enacting the TCPA, the Legislature explained that its purpose "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. &

REM. CODE ANN. § 27.002. The courts are to "construe it liberally to effectuate its purpose and intent fully." *Id.* § 27.011(b).

In deciding whether to grant a motion under the TCPA and dismiss the lawsuit, the statute instructs a trial court to "consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006. The court must determine: (1) whether the moving defendant has shown "by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of the right of free speech, the right to petition, or the right of association"; and (2) whether the plaintiff has shown "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(b), (c). The first step of this inquiry is a legal question we review de novo. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008).

The legislature's use of the term "prima facie case" in the second step implies a minimal factual burden: "[a] prima facie case represents the minimum quantity of evidence necessary to support a rational inference that the allegation of fact is true." *Rodriguez v. Printone Color Corp.*, 982 S.W.2d 69, 72 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). The statute nonetheless requires that the proof offered address and support each element of every claim asserted with clear and specific evidence. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b), (c).

13

Accordingly, we examine the pleadings and the evidence to determine whether Miller and the Hotel marshaled "clear and specific" evidence to support each alleged element of their causes of action. We review the pleadings and evidence in a light favorable to Miller and the Hotel. *Cf. Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004); *Fort Bend Indep. Sch. Dist. v. Gayle*, 371 S.W.3d 391, 394 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

### III. Right to dismissal under the TCPA

Patterson, IntegraCare, and NHI contend that they showed both that Miller and the Hotel's claims against them are in response to the exercise of their right to free speech, by a preponderance of the evidence, and that Miller and the Hotel failed to present clear and specific evidence to support each element of their claims to establish their prima facie case. We address each contention in turn.

#### A. Exercise of the right to free speech, petition, and association

The TCPA defines "the exercise of the right of free speech" as "a communication made in connection with a matter of public concern." *Id.* § 27.001(1). A "matter of public concern" includes, among other things, issues relating to "health or safety," and "environmental, economic, or community well-being." *Id.* § 27.001(7) (A), (B). The business of operating an assisted living facility is a highly regulated one. *See* Tex. HEALTH & SAFETY CODE ANN. §§ 247.001–247.069 (West 2010 & Supp. 2012) (the Assisted Living Facility

14

Licensing Act (AFLA)); 40 TEX. ADMIN. CODE §§ 46.1–46.71 (chapter entitled "Contracting to Provide Assisted Living and Residential Care Services"). To "ensure that assisted living facilities in this state deliver the highest possible quality of care," the legislature specifically has provided for both state and municipal enforcement of licensing requirements. *See* Tex. HEALTH & SAFETY CODE ANN. §§ 247.0011, 247.031 (West 2010). The Index's articles relate directly to Miller and the Hotel's obligations to fulfill the licensing requirements and standards set forth in these laws and regulations. AFLA not only permits, but encourages an open airing of information relating to an assisted living facility's quality of care. *See* TEX. HEALTH & SAFETY CODE ANN. § 247.068 (West Supp. 2012) (making it unlawful for a person licensed to operate an assisted living facility to retaliate "against a person for filing a complaint, presenting a grievance, or providing in good faith information relating to personal care services provided by the license holder").

In considering the statements attributed to Patterson and IntegraCare, we observe that the statute reflects the specific public concern of ensuring that assisted living facility residents retain the right to choose their own health care professionals. *See* TEX. HEALTH & SAFETY CODE ANN. § 247.067(c) (West Supp. 2012) (providing that "[a] resident of an assisted living facility has the right to contract with a [licensed] home and community support services agency . . . or

15

with an independent health professional for health care services"); *see also id.* § 247.0011(1) (including as components of quality care "resident independence and self-determination"). We hold that, as defined by the legislature, a preponderance of the evidence establishes that each of the articles at issue in this suit involve communications made in connection with a matter of public concern and relate to the exercise of free speech. Accordingly, Patterson, IntegraCare, and NHI have met the first requirement for obtaining dismissal under the TCPA. We next turn to whether the Hotel and Miller have adduced sufficient evidence to establish a prima facie case for each of their claims.

## B. Plaintiffs' prima facie case

### 1. Defamation

To maintain a defamation cause of action, the plaintiff must prove that the defendant (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or with negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).

"Whether words are capable of the defamatory meaning the plaintiff attributes to them is a question of law for the court." *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989). Questions of law are subject to de novo review. *In re*

16

*Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994). Whether a publication is an actionable statement of fact depends on its verifiability and the context in which it was made. *See Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002).

### a. NHI

As the owner of a newspaper, NHI claims that Miller and the Hotel failed to overcome NHI's evidence that the alleged defamatory statements either are substantially true or that it exercised due care in making them, thereby requiring dismissal of the claims against it.

Before addressing NHI's appellate challenge that its showing that the reported statements are substantially true entitles it to dismissal, we consider Miller and the Hotel's contention that the version of the TCPA in effect when NHI moved to dismiss their petition does not permit dismissal based on that defense. On rehearing, Miller and the Hotel point to the Legislature's recent passage of subsection 27.005(d), which provides:

> Notwithstanding the provisions of Subsection (c), the court shall dismiss a legal action against the moving party if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim.

Act of June 14, 2013, 83d Leg. R.S., ch. 1042, § 2, 2013 Tex. Sess. Law Serv. (codified at Tex. Civ. Prac. & Rem. Code Ann. § 27.005). According to Miller and the Hotel, the subsequent addition of subsection 27.005(d) shows that the pre-amendment Act's silence on this issue means that movants cannot base a dismissal

17

motion upon a showing of substantial truth. We disagree. Section 27.011 of the TCPA explains that "[t]his chapter does not abrogate or lessen any other defense . . . . available under other constitutional, statutory, case, or common law or rule provisions," and declares that "[t]his chapter shall be construed liberally to effectuate its purpose and intent fully." *Id.* § 27.011. The TCPA's declared purpose "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002 (West Supp. 2012). An interpretation of the TCPA that would prohibit a movant from procuring dismissal based on a showing of truth would thwart the Legislature's declared purpose for enacting the TCPA and render section 27.011 a nullity. TEX. GOV'T CODE ANN. § 311.023 (West 2013) (providing that, in interpreting statute, court may consider object sought to be attained by statute and consequences of particular statutory construction). The Legislature could not have intended such a result. *See In re Derzapf*, 219 S.W.3d 327, 332 (Tex. 2007). We reject Miller and the Hotel's urged interpretation and hold that the pre-amendment TCPA allows a movant to procure dismissal based on a successful showing of substantial truth.

18

Our grant of rehearing also permits us to revisit our analysis of the merits of NHI's substantial truth defense in light of the Supreme Court's intervening decision in *Neely v. Wilson*, No. 11-00228, 2013 WL 3240040 (Tex. June 28, 2013). In *Neely*, the Supreme Court clarified its prior opinion in *McIlvain v. Jacobs*, 794 S.W.2d 14 (Tex. 1990), explaining that accurate reporting of third-party allegations, standing alone, is not enough to satisfy the substantial truth defense; rather, if a media defendant "reports that allegations were made and an investigation proves those allegations to be true, the defamation claim is brought within the scope of the substantial truth defense." *Id.* at *8. The Court expressly disapproved of the analysis of *McIlvain*'s holding on that issue in *Green v. CBS, Inc.*, 286 F.3d 281 (5th Cir. 2002), and *KTRK Television v. Felder*, 950 S.W.2d 100 (Tex. App.—Houston [14th Dist.] 1997, no writ), both of which we relied on in analyzing NHI's challenge to Miller and the Hotel's claims. The United States Supreme Court has held that, in a suit against a media defendant, the plaintiff bears the burden of proving that the alleged defamatory statements are false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77, 106 S. Ct. 1558, 1564 (1986) (holding that common-law presumption that defamatory speech is false cannot stand when plaintiff sues media defendant for speech of public concern), *cited in Miranda v. Byles*, 390 S.W.3d 543, 554 (Tex. App.—Houston [1st Dist.] 2012, pet. filed). Our own court's precedent on this issue does not

19

clearly identify which party properly bears the burden, nor has the Texas Supreme Court definitively addressed that issue. *See Miranda*, 290 S.W.3d at 554. We need not decide it in this case, however, because, in moving for dismissal, the defendants either presented proof of substantial truth or due diligence in their reporting or contended that the speech itself is incapable of defamatory meaning.

We consider whether the record as a whole allows a rational inference that any of the Index's factual allegations was false. In the context of a defamation claim, a showing of falsity requires more than minor inaccuracies in the alleged defamatory statements. *See Turner v. KTRK Tel., Inc.*, 38 S.W.3d 103, 115 (Tex. 2000) (noting that substantial truth doctrine "precludes liability for a publication that correctly conveys a story's 'gist' or 'sting' although erring in the details"). A statement is substantially true if the alleged defamatory statement was no more damaging to plaintiff's reputation, in the mind of the average listener, than a truthful statement would have been. *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990); *Langston v. Eagle Printing Co.*, 797 S.W.2d 66, 69–70 (Tex. App.—Waco 1990, no writ) (concluding that statement is substantially true even if it exaggerates plaintiff's misconduct, as long as average reader would not attach any more opprobrium to plaintiff's conduct merely because of exaggeration).

Miller and the Hotel base their defamation claims against NHI on several statements made in the Index's reports, each of which we address in turn. They

20

first challenge the report that "The Texas Department of Aging and Disability Services [DADS] determined in a September 2010 investigation that [a nurse working at the Hotel] verbally abused, threatened, and intimidated a resident." This statement refers to an alleged incident in which a licensed vocational nurse (LVN) reacted to a patient's resistance to taking medication. Miller and the Hotel deny that the event took place, but do not contest that the DADS's investigation proved the contrary. The Index's report refers to "documents released by DADS" that the Hotel did not look into the resident's allegations before the state's investigation of the incident as well as other documentation, including the DADS's own investigative report and determination. Miller and the Hotel do not dispute the existence or authenticity of the documentation that the Index relied on in writing its article or the report that a Hotel attendant corroborated the resident's version of the event. The Index could accurately characterize the conduct found by the report as "elder abuse." As no evidence exists to counter the Index's showing that its report of the administrative determination is substantially true, it does not provide a basis for Miller and the Hotel's defamation claim.

Miller and the Hotel point next to the Index article entitled "Miller target of fraud probe," because, they contend, it falsely indicates that the Attorney General's office had opened an investigation into the Hotel owner's activities for possible Medicaid fraud. The article at issue focuses on the letters that the Hotel, under

21

Miller's signature, sent to its residents informing them that IntegraCare would not be permitted to enter its facility and purporting to require the residents to select as their home health care provider one of two named providers. The article attributes to Mike Burns, the Palo Pinto County District Attorney, statements that "th[e State Attorney General's] Medicaid fraud unit is opening a case on it," and that the district attorney's office had met with the Attorney General's office. In an affidavit accompanying NHI's motion to dismiss, Chris Agee, the Index's reporter who wrote the article, testified that Burns had informed him that his office had been investigating the legality of Miller and the Hotel's demands that the Hotel residents choose between only two health care providers as well as the propriety of the August 18, 2011 letter. Agee contacted the Attorney General's office to verify Burns's comments. The Attorney General's office confirmed that it had an ongoing investigation but would not provide further details.

With respect to the Index's August 31 article that Miller was the target of a fraud probe, the record contains evidence that the Hotel's state license to operate as an assisted living facility had lapsed and had not been renewed as of the date the Index published the article. Texas statute recognizes an assisted-living facility resident's right to contract with a licensed home and community support service agency to deliver health care services to the residents at the facility, a right echoed in the licensing standards for those facilities. *See* TEX. HEALTH & SAFETY CODE

22

ANN. § 247.067(c); 40 TEX. ADMIN. CODE 92.5(b). By requiring the residents to choose between two named providers and by prohibiting them from choosing IntegraCare as their provider, the Hotel imposed a restriction on the residents' choices in violation of applicable licensing requirements. The article specified that the district attorney's office was investigating the legality of the Hotel's attempt to restrict the residents to choose between two home health care providers. The article also explained that the investigation was "in its infancy" and ongoing, and reported that the Attorney General did not identify the investigation's subject matter, only that it was "an ongoing investigation." The fact that the article mentions Medicaid does not, on balance, tip it from being substantially true to being false and defamatory. *See Turner*, 38 S.W.3d at 115 (explaining that error in details does not render media defendant liable for defamation as long as article is substantially true).

Miller and the Hotel also point to the statement, in an August 23rd article, that the Hotel had served "eviction notices" on its residents. The article describes a Hotel letter as amounting to an eviction notice "for any resident unwilling to change his or her home health care provider" from IntegraCare to one of the two preferred home health providers. The article quotes the letter, verbatim, as directing residents who failed to change from IntegraCare that they should: "consider this letter to you to be Crazy Water's advance written notice of its intent

23

to terminate your current agreement effective September 30, 2011." While Miller and the Hotel object to the use of the term "eviction notice" to describe the letter's effect on residents who preferred to remain patients of IntegraCare, the characterization reasonably describes one possible view of the letter's content.

Finally, Miller and the Hotel allege, as defamatory, the Index's use of descriptive words in reporting about the living conditions at the Hotel, such as stating that the Hotel had a "myriad" of problems and describing water leaks as causing water to "cascade" into the building. In an affidavit submitted with the NHI's motion to dismiss, Index Editor David May testified that

> The Index has received, and, on occasion, reported on numerous complaints by others about the hotel . . . ranging from health and sanitary issues to fire code and structural violations. Many of these complaints resulted in investigations by City and State officials. At various times over the past few years, the City of Mineral Wells or the [DADS] threatened to shut down the Hotel because of structural or safety deficiencies.

Miller and the Hotel do not dispute May's testimony. The Index's immoderate—in the Hotel's view—word choice does not present a prima facie case that the descriptions, viewed in context, are less than substantially true. *See Langston*, 797 S.W.2d at 69 (exaggeration alone does not render substantially true publication actionable).

NHI also moved to dismiss on the ground that Miller and the Hotel failed to show that NHI acted negligently. Private plaintiffs must prove that the defendant

24

was at least negligent. *See Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819 (Tex. 1976) (holding that "a private individual may recover damages from a publisher or broadcaster of a defamatory falsehood as compensation for actual injury upon a showing that the publisher or broadcaster knew or should have known that the defamatory statement was false"); *see also Gertz*, 418 U.S. at 347, 94 S. Ct. 2997 (holding that states may define for themselves the appropriate standard of liability for a publisher of a defamatory falsehood injurious to a private individual "so long as they do not impose liability without fault"). Texas courts have defined negligence in the defamation context as the "failure to investigate the truth or falsity of a statement before publication, and [the] failure to act as a reasonably prudent [person]." *Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 631 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) (citing *El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403, 406 (Tex. 1969)).

In his affidavit submitted with NHI's motion, reporter Agee testified about the August 31 article:

> The Article summarizes the information I received from the state attorney general's office and from the local district attorney. It also summarizes the quotes and information I received from Charlotte Patterson at Integra. I had no reason to doubt the credibility of those sources. Based on the consistency of their statements, the consistency of the written documents shown to me, I had no reason to doubt the credibility or accuracy of those sources or the information conveyed by them. Based on this information and these sources, I believed at the time the Article was published that the statements therein were substantially true, if not literally true. . . .

25

The article also recites that "[n]either Miller nor [the Hotel] manager Juan Guardado returned numerous calls and e-mails requesting comment." Miller and the Hotel did not provide any evidence controverting these efforts or suggesting that Agee should have more fully investigated some aspect of the report to satisfy due diligence before reporting. Because Miller and the Hotel did not respond to the Index's showing by adducing clear and specific evidence that the challenged statements made in the articles were false or negligently reported, they have not made a prima facie case to support Miller and the Hotel's defamation claim against NHI.

### b. *Patterson and IntegraCare*

Patterson and IntegraCare contend that they should prevail on their motion to dismiss as well, because Miller and the Hotel have failed to provide evidence to show that Patterson acted negligently or intentionally in making any alleged defamatory statements. "Fault is a constitutional prerequisite for defamation liability." *McLemore*, 978 S.W.2d at 571 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 94 S. Ct. 2997, 3010–11 (1974)). "Private plaintiffs must prove that the defendant was at least negligent." *Id.* Miller and the Hotel's defamation claims against Patterson and IntegraCare stand on two statements quoted in the Index: (1) Patterson's statement that "[t]his case involves a number of possible areas of focus for prosecutors, such as "varying issues of patient choice and, I

26

think, the question of elderly abuse," and (2) her statement that Miller told IntegraCare that it was denying it access to the Hotel because IntegraCare was not "sending referrals."

We first examine whether either of these statements was defamatory. "[T]he meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of [the] publication and not merely on individual statements." *Bentley*, 94 S.W.3d at 579. To determine whether language is capable of having a defamatory meaning, a court should construe the statement as a whole, in light of the surrounding circumstances, and based upon a reasonable person's perception of it. *Vice v. Kasprzak*, 318 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

With respect to the first statement, "elderly abuse" was a strong choice of words, but Patterson softened her meaning by indicating that some doubted the applicability of the term, noting it only as a "possible area of focus." Her statement, viewed in context, refers to Miller and the Hotel's conduct in forcing the residents to choose between accepting one of two preferred providers or leaving the facility—and the official investigation into whether that conduct amounted to unlawful interference in the residents' choice of health care providers. The record shows that Patterson had personal knowledge that state and local officials had opened investigations into the matter. Miller and the Hotel acknowledge that

27

ongoing investigations existed; they take issue with the descriptions of the investigation's scope. But an objectively reasonable person could conclude, in context, that the statement had a basis in fact, and thus we hold that the record lacks a prima facie showing that Patterson failed to exercise due care in making it.

We examine the second statement to determine whether it is reasonably capable of a defamatory meaning. In *Musser v. Smith Protective Services*, the Texas Supreme Court held that a former employer's letter in which it sarcastically accused the plaintiff of taking accounts with him when he left the business was not reasonably capable of a defamatory meaning. 723 S.W.2d 653, 655 (Tex. 1987). The Court reasoned that the statement "call[ed] plaintiff a strong and successful competitor," and that it did not accuse the plaintiff of committing a crime or violating a law or contract. *Id.*

Miller and the Hotel do not offer an alternative reason for the end of the parties' business relationship with IntegraCare. In the articles, neither the Index nor Patterson suggested that the Hotel's problem lay in its motive for excluding IntegraCare as a provider; rather, their thrust was that, regardless of the reason for it, the Hotel's decision to exclude IntegraCare thwarted the patients' right to choose their own health care provider. We hold that a statement speculating about the Hotel's motive for its decision is not defamatory as a matter of law. *See id.*

28

We hold that Miller and the Hotel failed to marshal clear and clear and specific evidence to support their defamation claim against IntegraCare.

## 2. Business disparagement

To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987). "A business disparagement claim is similar in many respects to a defamation action." *Forbes Inc. v. Granada Bioscis., Inc.*, 124 S.W.3d 167, 170 (Tex. 2003). The two torts differ in the interest protected: a defamation claim protects an injured party's personal reputation, while a business disparagement claim protects economic interests. *Id.* "[A] business disparagement defendant may be held liable 'only if he knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion.'" *Id.* (quoting *Hurlbut*, 749 S.W.2d at 766).

Miller and the Hotel's business disparagement claims lack merit for the same reasons we reject their defamation claims: the lack of any evidence that the alleged defamatory statements made by the Index were false, and, with respect to Patterson, that she acted with malice—a higher burden than the negligent conduct that Miller and the Hotel failed to show for their defamation claim against her.

29

### *3. Tortious interference*

To establish a cause of action for tortious interference, a plaintiff must prove that (1) a contract subject to interference exists, (2) the defendant committed a willful and intentional act of interference with the contract, (3) the act proximately caused injury, and (4) the plaintiff sustained actual damages or loss. *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). "Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference." *Id.*

The Hotel offered its residents a contractual option of whether to remain at the Hotel and change to one of its two preferred health care providers or leave the Hotel to continue to receive health care services from IntegraCare. Nothing in the record suggests that NHI, Patterson, or IntegraCare influenced the Hotel residents to do anything other than exercise that option. Miller and the Hotel therefore fail to sustain their burden to make a prima facie case of interference with a contractual obligation.

## IV. Applicability of Statutory Exclusion for Commercial Speech

Finally, the Hotel contends that IntegraCare and NHI are for-profit corporations primarily engaged in the business of selling or leasing goods or services and that the challenged statements arise out of their provision of commercial services, thereby triggering the TCPA exclusion for commercial

30

speech. TCPA section 27.010 (b) provides that "[t]his chapter does not apply to a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product or a commercial transaction in which the intended audience is an actual or potential buyer or customer." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(b). The Hotel observes that (1) the statements involved the Hotel's business relationship with IntegraCare, and (2) the Hotel's residents were both IntegraCare customers and newspaper subscribers.

In *Simpson Strong-Tie Co., Inc. v. Gore*, 230 P.3d 1117 (Cal. 2010), the Supreme Court of California considered "the scope and operation of the exemption for commercial speech" set forth in the exemption to its own anti-SLAPP statute, which is similar to the Texas statute's exemption. *See id.* at 1123 (quoting CAL. CODE CIV. PROC. § 425.17(c)).[2] It devised a four-prong analysis for determining whether the exemption applies. Courts should examine whether:

---

2    The California provision declares that:

Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct by that person if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or

31

(1) the cause of action is against a person primarily engaged in the business of selling or leasing goods or services;

(2) the cause of action arises from a statement or conduct by that person consisting of representations of fact about that person's or a business competitor's business operations, goods, or services;

(3) the statement or conduct was made either for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services; and

(4) the intended audience for the statement or conduct [is an actual or potential buyer or customer].

*Id.* at 1129.[3]

The *Simpson* court first noted, as a matter of statutory construction, that the burden of proving the applicability of an exemption from the provisions of an anti-SLAPP statute falls on the party asserting it. *See id.* at 1124 ("One claiming an exemption from a general statute has the burden of proving that he comes within the exemption.") (citations omitted); *see generally McIntyre v. Ramirez,* 109 S.W.3d 741, 745 (Tex. 2003) (holding that doctor had burden of proof to show he was exempted from general applicability of emergency care statute). We follow the California Supreme Court's analysis in *Simpson* and conclude that the burden

---

services, [and ¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer . . . .

CAL. CODE CIV. PROC. § 425.17(c).

[3] We have modified the fourth prong of this test to track the Texas statute. *Compare* TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(b) *with* CAL. CODE CIV. PROC. § 425.17(c).

rested with the Hotel to show that the statute does not apply to its suit against NHI and IntegraCare. *See Simpson*, 230 P.3d at 1126 ("The burden of proof as to the applicability of the commercial speech exemption, therefore, falls on the party seeking the benefit of it—i.e., the plaintiff.").

The Hotel did not meet its burden to establish that the statements at issue were commercial speech unprotected by the TCPA. With respect to the newspaper, it is undisputed that NHI was in the business of reporting community events, but the Hotel's complained-of statements do not arise out of the lease or sale of the goods or services that NHI sells—newspapers. To read news content to constitute statements "arising out of the sale or lease" of newspapers would swallow the protections the statute intended to afford; such a construction does not match the statute's dual purpose of safeguarding the right to speak, to associate, and to petition the government, while protecting the right of an aggrieved person to file a meritorious defamation suit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.002.

As for IntegraCare, its employees had a statutory duty to report problems with respect to care of the elderly to certain state authorities, and it proffered Patterson's affidavit that her statements involved matters of public health and safety. *See e.g.,* TEX. HUM. RES. CODE ANN. § 48.051(a) (West 2013) (requiring that "a person having cause to believe that an elderly . . . person is in the state of

33

abuse, neglect, or exploitation . . . shall" report same to Department of Protective and Regulatory Services); TEX. HEALTH AND SAFETY CODE ANN. § 260A.002(a) (West Supp. 2012) ("A person, including an owner or employee of a facility, who has cause to believe that the physical or mental health or welfare of a resident has been or may be adversely affected by abuse, neglect, or exploitation caused by another person shall report the abuse, neglect, or exploitation in accordance with this chapter."). Patterson complained about the Hotel's actions to the local district attorney, the Department of Aging and Disability Services, the Mineral Wells City Manager, and the Texas Attorney General Consumer Protection Division. Patterson was also a source for the newspaper coverage.

The Hotel counters that its business dispute with IntegraCare was the reason Patterson complained, not any public safety concern. The motive for making the statements aside, however, Patterson made none in connection with "the sale or lease of goods, services, or an insurance product or a commercial transaction," nor was her "intended audience an actual or potential buyer or customer." Although the Hotel's residents may have learned about Patterson's statements and complaints through reading the newspaper, she did not direct the complained-of comments to them to secure the sale of goods or services. The newspaper concluded that the matters involved in Patterson's statements were newsworthy to the general public, and thus reported them aside from IntegraCare's commercial

34

interests. The Hotel did not adduce evidence that the statements were otherwise made in a commercial context. We hold that the Hotel failed to establish that its suit against IntegraCare involved statements, directed to customers, arising out of a commercial transaction, rather than statements, directed to state officials and the general public, concerning a matter of public health and safety.

## Conclusion

We hold that NHI, Patterson, and IntegraCare satisfied their burden under the TCPA to show that Miller and the Hotel's claims against them are based on statements that they made in the exercise of rights to free speech and to petition the government. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b). We further hold that Miller and the Hotel have failed to sustain their burden to show a prima facie case for each essential element of their claims, or that their lawsuit falls within the commercial speech exemption to the statute. *See id.* §§ 27.005(c), 27.010(b). We therefore reverse the trial court's denial of the defendants' motions to dismiss, and we remand the case to the trial court for further proceedings as required by the statute and to order dismissal of the suit. *See id.* § 27.009(a).


Jane Bland
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.

35