Opinion issued August 8, 2017



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-16-00512-CV

_____

### MEMORIAL HERMANN HEALTH SYSTEM, Appellant

### V.

### SAMIA KHALIL, M.D., Appellee

On Appeal from the 334th District Court
Harris County, Texas
Trial Court Case No. 2015-77483

## MEMORANDUM OPINION ON REHEARING

On March 28, 2017, we issued a memorandum opinion in this case. Samia Khalil filed a motion for rehearing. We deny the motion but withdraw our memorandum opinion and issue this memorandum opinion in its place. Our disposition of the case remains unchanged.

After 40 years of employment at Memorial Hermann hospital, Dr. Samia Khalil sued Memorial Hermann Health System for defamation, tortious interference with an existing contract, conspiracy, and intentional infliction of emotional distress. Khalil, age 77, also sued for age discrimination. Memorial Hermann sought to dismiss several of her claims under summary dismissal procedures found in the Texas Citizens Participation Act (TCPA).[1] In turn, Khalil filed a TCPA motion to dismiss Memorial Hermann's TCPA motion. Both motions were denied by operation of law.

In two issues, Memorial Hermann argues that it was entitled to dismissal of Khalil's challenged claims. Through a cross-appeal, Khalil argues that, while Memorial Hermann's motion was properly denied, her TCPA counter-motion was denied in error and that she is, therefore, entitled to recover attorney's fees.

We reverse the denial of Memorial Hermann's motion, affirm the denial of Khalil's motion, and remand for further proceedings.

**Background**

Dr. Samia Khalil worked as a pediatric anesthesiologist at Memorial Hermann hospital for four decades. Along with those duties, she taught pediatric anesthesiology at The University of Texas Health Science Center at Houston (UT

---

[1] *See* TEX. CIV. PRAC. & REM. CODE § 27.001–.011 (Chapter 27 is titled, "Actions Involving the Exercise of Certain Constitutional Rights.").

Health). UT Health is not a defendant in Khalil's lawsuit. According to her petition, Dr. Khalil was approached in 2014 by Dr. Carin Hagberg—who was both the UT Health chair of the anesthesia department and the Memorial Hermann chief of anesthesiology—about "vague complaints" made to "hospital administration" about Dr. Khalil. Hagberg and Khalil agreed that Khalil would enter into a UT Health corrective action plan.

The corrective action plan was not completed before the deadline for Khalil to submit a complete application for recredentialing at Memorial Hermann. Citing her failure to submit a complete application by the deadline—versus a determination that she was not competent for recredentialing—Memorial Hermann announced that Khalil's credentials had expired, which meant that she was no longer able to practice medicine there. Khalil sued Memorial Hermann.

Below is a more detailed account of the events leading up to Khalil's departure from Memorial Hermann and of the Memorial Hermann and UT Health documents created during those two entities' investigations into Khalil's competence, which she submitted to the trial court.

A.  **Khalil's corrective action plan and the investigations into her competence**

Due to "anecdotal" statements questioning Khalil's patient care, compliance with hospital procedures, and collegiality, Hagberg approached Khalil in 2014 to establish a corrective action plan. The corrective action plan was entered between

3

Khalil and UT Health, not Memorial Hermann. It required Khalil to be assessed by UT Health's internal Employee Assistance Program, follow any EAP recommendations, participate in a chart review of her recent cases, and comply with applicable standards and guidelines. UT Health prohibited Khalil from "faculty clinical care" of patients while she was taking action pursuant to the corrective action plan and it was assessing her EAP compliance and chart audit. The UT Health corrective action plan began just a few weeks before Khalil's Memorial Hermann recredentialing deadline: December 31, 2014.

UT Health informed Memorial Hermann's credentials committee chair, Mark Farnie, of Khalil's corrective action plan. As the December 2014 deadline drew near, Memorial Hermann informed Khalil that she would be given only a limited, 13-month renewal[2] because of the on-going plan and because the hospital wanted to engage her "in quality and patient safety activities and to promote collegial working relationships in the clinical areas." Therefore, her credentials would need to be renewed again or they would expire at the end of January 2016.

Khalil met with a UT Health EAP representative, as required by her corrective action plan. That representative recommended that Khalil undergo an outside assessment. Khalil refused to participate, stating in a letter dated November 30, 2015 that the process was "flawed by design and intrinsically unfair." Khalil

---

[2]     It was customary for any renewal of credentials to have a term of two years.

4

eventually agreed to participate in an outside assessment, but that assessment was not completed before the January 2016 recredentialing deadline. As a result, she did not have a completed application by the deadline. Memorial Hermann then declared that Khalil's credentials had expired because she failed to complete her renewal application by the deadline.

Khalil challenges Memorial Hermann's characterization and asserts that Memorial Hermann's intentional delay tactics caused her to not meet the deadlines. Khalil also asserts that Memorial Hermann coordinated with UT Health to have UT Health remove her from clinical care, which allowed Memorial Hermann to avoid the procedural protections found in its medical staff bylaws. She asserts that she was denied notice, hearing, and due process. Khalil describes the chain of events as "orchestrated" and claims the two entities placed her in a "catch-22" that prevented the renewal of her credentials.

Just before her credentials expired, Khalil sued Memorial Hermann for various claims, including defamation, based on statements made about her during Memorial Hermann's and UT Health's investigations into her competence, including privileged peer-review statements made by various committees.

## B. Statements made about the on-going investigations into Khalil's competence

Some of the statements underlying Khalil's suit are communications confirming that UT Health had placed limitations on Khalil's clinical care and

addressing whether those limitations prevented her from continuing with her medical research activities. Other communications directly address Khalil's competence. For example, in a December 8, 2015 letter to Khalil from Memorial Hermann's chief of staff, Dr. James McCarthy, which is marked as a peer-review document, Dr. McCarthy states that Memorial Hermann's medical-executive committee reviewed the quality-review committee's findings and "agreed" that Khalil's clinical practice "represents the potential of imminent patient harm" and, therefore, decided that she was "not to care for patients at this hospital at this time."

The Memorial Hermann chief of staff's letter listed specific negative findings, including that Khalil appeared unwilling to change her historical approach, did not communicate well with team members, generally expressed a rigidity unsuitable to a surgical-team environment, had not read patient records or adequately communicated with surgeons on occasion, and "demonstrated lack of insight (and basic knowledge)." The letter then reiterated the committee's conclusion that Khalil's practice creates "the potential of imminent patient harm and will not be permitted if [she] attempt[s] to exercise clinical privileges." Finally, the letter informed Khalil that the hospital's medical-executive committee and "[e]veryone involved" was "trying to promote patient safety and . . . acting in good faith to that end."

6

## C. Khalil sues and Memorial Hermann seeks dismissal

Based on the letter from Memorial Hermann's chief of staff as well as other communications, Khalil sued Memorial Hermann for defamation and other claims. Memorial Hermann answered by asserting a general denial and pleading the affirmative defenses of qualified common-law privilege and statutory immunity, citing various federal and state statutes related to peer-review protections. *See* 42 U.S.C. §§ 11101–11152; TEX. OCC. CODE § 160.010; TEX. HEALTH & SAFETY CODE § 161.033.

Memorial Hermann also moved to dismiss several of Khalil's claims, arguing that they infringed on its constitutional right to free speech and its statutory right to free speech under the TCPA. Khalil amended her petition to assert, as an affirmative defense, that the TCPA is unconstitutional as applied to her because its application would deprive her of "her right to sue for reputational torts that are expressly protected under the Texas Constitution." She also filed a TCPA motion to dismiss Memorial Hermann's TCPA motion.

A hearing was held on the competing motions on May 6, 2016, thereby establishing June 6 as the deadline for the trial court to issue a ruling on the motions. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(a). No ruling issued by that date; therefore, both motions were denied by operation of law. *Id.* § 27.008(a).

7

Memorial Hermann appeals the denial of its motion. Through a cross-appeal, Khalil appeals the denial of her motion as well.

## Texas Citizens Participation Act

Memorial Hermann and Khalil filed competing motions to dismiss under the Texas Citizens Participation Act. *Id.* § 27.001–.011. The TCPA is found in Chapter 27 of the Civil Practice and Remedies Code, which is titled, "Actions Involving the Exercise of Certain Constitutional Rights." The TCPA's purpose is to protect "citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them." *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015). It does so by creating "a new set of procedural mechanisms through which a litigant may require, by motion, a threshold testing of the merits of legal proceedings or filings that are deemed to implicate the expressive interests protected by the statute, with the remedies of expedited dismissal, cost-shifting, and sanctions for any found wanting." *Serafine v. Blunt*, 466 S.W.3d 352, 369 (Tex. App.—Austin 2015, no pet.) (Pemberton, J., concurring); *see* TEX. CIV. PRAC. & REM. CODE § 27.003–.009.

## A. TCPA's dismissal provision and relevant statutory definitions

Section 27.003 of the TCPA contains the dismissal provision both parties have invoked in this suit. It provides that a party may file a motion to dismiss a legal action against it when the legal action "is based on, relates to, or is in

response to [that] party's exercise of" one of three rights: free speech, petition, or association. TEX. CIV. PRAC. & REM. CODE § 27.003(a). The Legislature defined "[l]egal action" as "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." *Id.* § 27.001(6). The Legislature also statutorily defined the three sets of rights protected by TCPA summary-dismissal procedures, including a statutorily defined right of free speech. *Id.* § 27.001(2)–(4); *id.* § 27.001(3) ("Exercise of the right of free speech means a communication made in connection with a matter of public concern.") (internal quotation marks omitted).

## B.     TCPA's shifting burdens of proof

When a movant seeks dismissal under the TCPA, the movant has the initial burden to show "by a preponderance of the evidence" that the nonmovant has asserted a "legal action" that is "based on, relates to, or is in response to" the movant's exercise of one of the three rights delineated in the statute. *Id.* § 27.005(b). If the movant meets that burden, the burden shifts to the nonmovant to establish "by clear and specific evidence" a "prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). Dismissal may be required, "[n]otwithstanding" the nonmovant's evidence proffered to meet its burden, if the movant establishes "by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." *Id.* § 27.005(d).

The trial court considers the pleadings and any supporting and opposing affidavits to evaluate whether each party has met its burden. *Id.* § 27.006(a); *In re Lipsky*, 460 S.W.3d at 587.[3]

**Standard of Review**

We review de novo the denial of a TCPA motion to dismiss. *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 353 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 80 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). This de novo standard applies whether the motion is denied by written order or by operation of law. *See Avila v. Larrea*, 394 S.W.3d 646, 652–53, 656 (Tex. App.—Dallas 2012, pet. denied). We consider the parties' pleadings, affidavits, and any discovery that might have been authorized by the trial court on the issues. TEX. CIV. PRAC. & REM. CODE § 27.006. We view the evidence in the light most favorable to the nonmovant. *Cheniere Energy, Inc. v. Lotfi*, 449 S.W.3d 210, 214 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Serafine*, 466 S.W.3d at 369 n.28.

Likewise, we review de novo issues of statutory construction. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). When construing a statute, our

---

[3]    The TCPA contains a mechanism by which the trial court can permit limited discovery, but that procedure was not invoked in this suit. *See* TEX. CIV. PRAC. & REM. CODE § 27.006(b).

objective is to give effect to legislative intent, which requires us to look first to the statute's plain language. *Leland v. Brandal*, 257 S.W.3d 204, 206 (Tex. 2008). If that language is unambiguous, we interpret the statute according to its plain meaning. *Id.*; *see Molinet*, 356 S.W.3d at 411.

With regard to Memorial Hermann's denied TCPA motion, we must determine whether Khalil asserted a legal action that is based on, relates to, or is in response to Memorial Hermann's exercise of its right of free speech as defined in the TCPA, and, if so, whether she has established a prima facie case for each essential element of each of her claims that are the subject of the dismissal motion. We must also consider whether Memorial Hermann, nonetheless, has established each essential element of a valid defense to those claims.

Khalil's TCPA motion to dismiss Memorial Hermann's motion requests the same analysis. One step would be to determine whether Memorial Hermann has met its burden to establish a prima facie case for dismissal of Khalil's claims. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c). Because evaluating Memorial Hermann's dismissal motion would be a necessary step to disposing of Khalil's motion, we begin with Memorial Hermann's motion.

**Memorial Hermann's Motion to Dismiss**

We begin with the threshold question of whether Memorial Hermann met its burden under the TCPA to establish by a preponderance of the evidence that Khalil

brought a legal action that "is based on, relates to, or is in response to" its exercise of the right of free speech, as defined in the TCPA.

## A.      Whether Memorial Hermann satisfied its burden

The TCPA defines the "[e]xercise of the right of free speech" as a "communication made in connection with a matter of public concern." *Id.* § 27.001(3). A "[c]ommunication includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1). It includes both private and public communications. *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015). A "[m]atter of public concern" is defined to include, among other things, an issue related to "health or safety." TEX. CIV. PRAC. & REM. CODE § 27.001(7)(A).

The letter to Khalil from Memorial Hermann's chief of staff criticized her past job performance, concluded that her "clinical practice represents the potential of imminent patient harm," and directed that she be prohibited from engaging in clinical duties for the stated purpose of "promot[ing] patient safety."

Whether a privately-employed person satisfactorily performs her job—while an important issue to the employer—is generally not a matter that would be considered a public concern for First Amendment purposes. *See Bates v. Dallas Indep. Sch. Dist.*, 952 S.W.2d 543, 550 (Tex. App.—Dallas 1997, writ denied). But the TCPA defines "[m]atter of public concern" to include issues related to "health

12

or safety," and statements concerning a healthcare professional's competence relate to matters of public concern under the TCPA. *See Lippincott*, 462 S.W.3d at 510.

In *Lippincott*, the Texas Supreme Court held that internal emails concerning whether a nurse anesthetist properly provided medical services to patients were communications made in connection with a matter of public concern. *Id.* at 510. The nurse contracted to provide anesthesiology services at a surgical center. *Id.* at 508. Two surgical-center administrators allegedly made disparaging comments about him. *Id.* One of the administrators sent emails summarizing reports he had received, and in some cases investigated, that the nurse had endangered patients. *Id.* at 508–09. The administrator's emails asserted that the nurse "failed to provide adequate coverage for pediatric cases," administered a "different narcotic than was ordered prior to pre-op or patient consent being completed," falsified scrub tech records, and violated the company's sterile protocol policy. *Id.* at 510.

The nurse sued the administrators for defamation, tortious interference with business relations, and conspiracy to interfere in business relations—the same types of claims Khalil asserts. *Id.* at 509. The defendants moved to dismiss the nurse's claims under the TCPA, arguing that the allegedly defamatory emails evidenced communications about matters of public concern. *Id.*

13

The Texas Supreme Court held that the provision of medical services by this healthcare professional constituted a matter of public concern and, as a result, the communications[4] made about his competence were made in connection with a matter of public concern for TCPA applicability purposes. *Id.* at 510; *see ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 901 (Tex. 2017) (per curiam) (relying on text of TCPA to hold that statute requires "only that the defendant's statements are 'in connection with' 'issue[s] related to' health, safety, environmental, economic, and other identified matters of public concern chosen by the Legislature," and reversing appellate court's holding that relationship had to be more than "tangential").

Memorial Hermann relies heavily on the *Lippincott* opinion, in part because of the factual similarities between the two cases. In both cases, the nonmovant provided anesthesiology services to surgical patients and the challenged communications were made between health-facility staff members about the healthcare professional's competence. In *Lippincott*, the Court held that the

---

[4]    The Court did not evaluate whether each statement about Whisenhunt, when viewed independently of the other statements, addressed a matter of public concern. Instead, having found that at least one statement was a communication made in connection with a matter of public concern, the Court determined that Whisenhunt's suit was in response to the exercise of the right of free speech, as defined in the TCPA, and that the TCPA applied. *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 510 (Tex. 2015); *but see Combined Law Enforcement Ass'n of Tex. v. Sheffield*, No. 03-13-00105-CV, 2014 WL 411672, at *5 (Tex. App.—Austin Jan. 31, 2014, pet. denied) (mem. op.) (analyzing each communication separately to determine if TCPA applied).

communications addressed a matter of public concern and fell within the purview of the TCPA. *Id.* at 510. Memorial Hermann seeks the same result here.

We agree that Memorial Hermann's communications closely resemble the statements held to address matters of public concern in *Lippincott*. The communications include a letter from Memorial Hermann's chief of staff listing various peer-review and credentialing committee findings, including that Khalil failed to read patient records, communicate with surgeons, demonstrate "insight" or "basic knowledge," recognize serious symptoms, and acknowledge incorrect dosing. It further stated that Khalil's "clinical practice represents the potential of imminent patient harm," which required that she be prohibited from engaging in clinical duties so as "to promote patient safety."

We conclude that this Memorial Hermann communication regarding Khalil's competence was a communication made in connection with an issue related to health or safety, and thus, a matter of public concern. *See* TEX. CIV. PRAC. & REM. CODE § 27.001(3), (7)(A). Khalil's legal action, in which she sued Memorial Hermann for defamation, fraud, and other torts, was "in response to" this and five other communications addressing her competence. *See id.* § 27.003(a). Accordingly, Memorial Hermann has met its initial burden of invoking the TCPA. *See id.* § 27.003(a), .005(b); *see also Coleman*, 512 S.W.3d at 901-02; *Lippincott*,

15

462 S.W.3d at 510 (considering subject of internal emails collectively to conclude that TCPA applied).

We turn next to whether Khalil met her burden, after it shifted to her, to establish a prima facie case by clear and specific evidence for each essential element of each of her claims that were subject to dismissal. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c).

## B. Whether Khalil satisfied her burden

Memorial Hermann sought dismissal of six of Khalil's claims: defamation, tortious interference, fraud, conspiracy, "assisting or encouraging," and intentional infliction of emotional distress. We consider defamation first.

### 1. Defamation

"Defamation is generally defined as the invasion of a person's interest in her reputation and good name." *Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013). Defamatory statements are those that tend to (1) "injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury" or (2) "impeach any person's honesty, integrity, virtue, or reputation." TEX. CIV. PRAC. & REM. CODE § 73.001; *see Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 854 (Tex. App.—Dallas 2003, no pet.). The elements of a defamation claim include "(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite

16

degree of fault, and (4) damages, in some cases." *In re Lipsky*, 460 S.W.3d at 593.

A statement is considered "published" when it is communicated to a third person

who is capable of understanding its defamatory meaning and in such a way that the

person did understand its defamatory meaning. *Thomas-Smith v. Mackin*, 238

S.W.3d 503, 507 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Statements are

considered published even if they are made to employees and managers in the

same company. *Stephens v. Delhi Gas Pipeline Corp.*, 924 S.W.2d 765, 769 (Tex.

App.—Texarkana 1996, writ denied).

### a. "Requisite degree of fault" that applies to Khalil's defamation claim

The requisite degree of fault that applies can be determined by either the

status of the individual allegedly defamed or the context in which the statement

was made. *See Neely v. Wilson*, 418 S.W.3d 52, 61 (Tex. 2013); *Maewal v.*

*Adventist Health Sys./Sunbelt, Inc.*, 868 S.W.2d 886, 893 (Tex. App.—Fort Worth

1993, writ denied); *Combined Law Enforcement Ass'n of Tex. v. Sheffield*, No. 03-

13-00105-CV, 2014 WL 411672, at *6–8 (Tex. App.—Austin Jan. 31, 2014, pet.

denied) (mem. op.). Regarding status, a private individual suing for defamation is

required to prove negligence in the making of the statement, while a public figure

is required to prove actual malice. *Neely*, 418 S.W.3d at 61.

Regarding context, a plaintiff must prove actual malice regardless of her

status when her claims raise a qualified privilege or immunity defense. *See Shell*

17

*Oil Co. v. Writt*, 464 S.W.3d 650, 655 (Tex. 2015); *Sheffield*, 2014 WL 411672, at *6–8; *Maewal*, 868 S.W.2d at 893; *Bergman v. Oshman's Sporting Goods, Inc.*, 594 S.W.2d 814, 816 & n.1 (Tex. Civ. App.—Tyler 1980, no writ). A qualified privilege exists for employers and employees communicating about the competence of another employee when the communication is made to a person having a corresponding interest or duty in the matter being discussed. *Bergman*, 594 S.W.2d at 816; *see Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 630 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). When a qualified privilege exists, "the law presumes good faith and want of malice." *Marathon Oil*, 682 S.W.2d 630. "Once the conditional privilege is shown to exist the burden is on the plaintiff to show that the privilege is lost, that is, the plaintiff must then show malice." *Bolling v. Baker*, 671 S.W.2d 559, 564–65 (Tex. App.—San Antonio 1984, writ dism'd w.o.j.).

"The peer review process is analogous to an employer's performance assessment of an employee or an employer's investigation into an employee's alleged wrongdoing." *Maewal*, 868 S.W.2d at 893. Peer-review activities, therefore, are also entitled to a qualified privilege. *See St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 509 (Tex. 1997). Because of the qualified privilege's presumption that a peer-review committee acted without malice, a plaintiff-employee suing for defamation for statements by a medical-peer-review committee

18

must establish, as an element of her claim, actual malice. *See Ching v. Methodist Children's Hosp.*, 134 S.W.3d 235, 242 (Tex. App.—Amarillo 2003, pet. denied); *Dallas Cty. Med. Soc'y v. Ubinas-Brache*, 68 S.W.3d 31, 40 (Tex. App.—Dallas 2001, pet. denied); *Maewal*, 868 S.W.2d at 893. Thus, the "requisite degree of fault" that applies here is malice.

### b. Communications underlying Khalil's defamation claim

Khalil points to six communications in support of her defamation claim against Memorial Hermann. These communications fall within three groups: (1) non-defamatory employee correspondence, (2) a letter written by Carin Hagberg, who is the UT Health chair of anesthesiology department as well as the Memorial Hermann chief of anesthesia department, to formally respond to a grievance brought by Khalil, and (3) Memorial Hermann peer-review records.

### 1) Non-defamatory employee correspondence

Many of the statements underlying Khalil's defamation suit were in employee correspondence. The first correspondence is an email string in which Michael Fallon, the director of UT Health's clinical research unit, asked Carin Hagberg to clarify Khalil's practice restrictions. Fallon explained that he had been told "indirectly" that Khalil is not "allowed" to "work" but added that "I, obviously, know none of the details" about that limitation. He asked whether the limitation meant that Khalil's research activities also were limited. Hagberg

responded that Khalil "cannot provide clinical services" but "can continue to perform research work . . . ." As the email string continued, Hagberg further clarified Khalil's restrictions: "I informed Dr. Khalil that she would be restricted from clinical duties until further evaluation of her care was completed on August 2, 2015. . . . She was instructed that she could continue her clinical studies but she cannot provide hands-on patient care." All of the communications in this email string contain assertions of fact that Khalil's duties had been restricted; they do not make any defamatory statements regarding her medical competence.

The second communication is an email to Khalil confirming that, while she was not permitted to perform clinical services, she could work with others who do perform clinical services in order to continue her research protocols. This email also contains only assertions of fact and does not contain any defamatory statements regarding Khalil's competence.

The third communication is an email from Hagberg to Khalil informing her that she is not permitted to engage in clinical research. The email required Khalil to identify the individual who would be taking over her ongoing research and to provide that information to Hagberg and "Dr. Dougherty." According to Khalil, this email demonstrates that "Dr. Dougherty" knew of her job limitations even though, according to her, that doctor is not on a peer-review committee. Nothing in this exhibit or in the record indicates who Dr. Dougherty is or whether that

doctor's interest in the matter is in a role at UT Health or Memorial Hermann. Regardless, the email, at most, suggests that Khalil no longer held her former position, which is an accurate, nondefamatory assertion. *See Klentzman v. Brady*, 312 S.W.3d 886, 898–99 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (holding that truth is defense to defamation claim).

### 2) Letter written by Hagberg in response to formal grievance brought by Khalil

The next document relied on by Khalil to demonstrate that Memorial Hermann made defamatory statements about her is a letter from Carin Hagberg, who holds positions at both UT Health Medical School and Memorial Hermann. The letterhead and signature block on Hagberg's letter indicate that the letter was written in her capacity at the UT Health Medical School. The letterhead specifies that it is a UT Health Medical School correspondence, and her signature block includes the designation of "Joseph C. Gabel Professor and Chair of the Department of Anesthesiology." Hagberg's letter is addressed to "Kevin A. Moreno, PhD., University of Texas Distinguished Teaching Professor, Associate Dean for Faculty Affairs, UT Health Medical School." It states that it is written "in response to the formal grievance initiated by Dr. Khalil" to "provide some background."

Exhibits to Khalil's fourth amended petition provide context to this letter. Her exhibits include a copy of the UT Health faculty grievance policy as found in

21

the UT Health Handbook of Operating Procedures. The policy addresses "faculty grievances" about "actions of supervisors, department chairs or equivalent and deans as to the workload, compensation, working conditions, infringement of academic freedom, and the interpretation of a rule, regulation or policy." The policy specifies that a faculty member who has a grievance against a department chair—which was Hagberg's position—should direct the grievance to a dean. The policy further provides that a UT Health employee against whom a grievance is brought "will respond to the grievance within seven calendar days" and that failure to respond within that time will result in an automatic advancement of the appeal to the next administrative level.

Hagberg's letter refers to the fact that Khalil had filed a formal grievance, states that her letter is written in response to that grievance, and is addressed to a UT Health associate dean. Hagberg's letter provides "background" information, including that she had developed an action plan for Khalil that included a UT Health employee assistance program assessment, a focused professional practice evaluation of her competence, a chart review, and a requirement that Khalil comply with hospital and department standards and practice guidelines. The letter states that various nurses, anesthesiologists, and surgeons were interviewed as part of the focused professional practice evaluation and that they reported negatively on Khalil's professionalism and collegiality. According to Hagberg's letter, some

22

described Khalil as "difficult" and stated that she would not use new procedures and instead used techniques that unnecessarily prolonged anesthesia and surgery time. The letter concludes by stating that Khalil's restrictions will continue "at least until she has completed an evaluation by one of the two approved program's recommended by" the UT Health EAP representative.

Khalil argues that Hagberg's letter is evidence that Memorial Hermann defamed her, pointing out that Hagberg wore "two hats," working for both Memorial Hermann and UT Health. But Hagberg's letter was written in the context of Khalil filing a grievance under the UT Health grievance policy. This policy allows UT Health faculty members (like Khalil) to formally complain about actions of their UT Health supervisors, department chairs (like Hagberg), and deans. Nothing about the written grievance policy or Hagberg's response indicated that Hagberg was writing as a Memorial Hermann employee. Instead, everything about the letter, including the letterhead, signature block, and content of the letter, demonstrated that Hagberg wrote the letter in her position at UT Health as part of a UT Health employment matter. The letter does not support Khalil in meeting her burden to establish by clear and specific evidence a prima facie case for each essential element of Khalil's defamation claim against Memorial Hermann.

We turn next to the Memorial Hermann peer-review records.

23

### 3) Memorial Hermann peer-review records

The final two documents Khalil identifies as evidence that Memorial Hermann defamed her are letters addressing Memorial Hermann's peer-review evaluation of Khalil's medical competence.

The first is a letter dated October 14, 2015 from the co-chairs of the Memorial Hermann pediatric medical-staff quality-review committee. At the top is a peer-review committee reference. It states: "PRIVILEGED AND CONFIDENTIAL RECORDS AND PROCEEDINGS OF A MEDICAL PEER REVIEW COMMITTEE." It identifies two cases that were brought to the attention of the quality-review committee, states a date that the committee will meet to review the cases, and requests that Khalil submit a written analysis of each case for the committee's consideration.

The second is the December 8, 2015 letter discussed above in which the Memorial Hermann chief of staff informs Khalil that the medical-executive committee reviewed the quality-review committee's findings and "agreed" that Khalil's clinical practice "represents the potential of imminent patient harm" and, therefore, that she was "not to care for patients at this hospital at this time." The letter indicates that a copy would go to a "credentials file." This letter, like the previous one, contains a peer-review notation: "PRIVILEGED AND CONFIDENTIAL RECORDS AND PROCEEDINGS OF A MEDICAL PEER

24

REVIEW COMMITTEE." It informs Khalil that the committee is acting in an effort "to promote patient safety and is acting in good faith to that end." The letter included specific negative findings, including:

1. Dr. Khalil has one way of doing things and appears unwilling to consider changing her historical approach;

2. Dr. Khalil does not communicate well with team members;

3. There was apparent lack of teamwork in the two cited cases;

4. Dr. Khalil had not read the patient records or communicated with the surgeons on an agreed plan prior to either case;

5. Dr. Khalil's recollections did not comport with documentation in the medical records and with interviews with other team members;

6. Dr. Khalil expressed a rigidity and "militancy" that has no place in the surgical suite team environment; and

7. Dr. Khalil demonstrated lack of insight (and basic knowledge) and demonstrated no willingness to objectively review the cases. She did not recognize symptoms of hypercarbia and did not acknowledge incorrect morphine dosage in the ENT case.

The letter then reiterated the committee's conclusion that "[Khalil's] clinical practice represents the potential of imminent patient harm and will not be permitted if [she] attempt[s] to exercise clinical privileges."

The burden is on Khalil to establish by clear and specific evidence a prima facie case for each essential element of her defamation cause of action, including "the requisite degree of fault." *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c); *In re Lipsky*, 460 S.W.3d at 593. Khalil argues that the "requisite degree of fault" is

not malice because she is not a public figure. We disagree that malice is not required.

These two letters identify themselves, on their face, as peer-review documents.[5] Section 160.010 of the Occupations Code states that a "health care entity that, without malice, participates in medical peer review or furnishes records, information, or assistance to a medical peer review committee or the board is immune from any civil liability arising from that act." TEX. OCC. CODE § 160.010(c). Further, "[a] cause of action does not accrue . . . against a health care entity from any act, statement, determination or recommendation made, or act reported, without malice, in the course of medical peer review." *Id.* at § 160.010(b). Because these two documents underlying Khalil's tort claims are peer-review documents, Khalil has the burden to establish malice for the statements in these letters. *See Ubinas-Brache*, 68 S.W.3d at 40; *Maewal*, 868 S.W.2d at 893.

Khalil responds that Memorial Hermann's insistence, on appeal, that she has the burden to establish malice, is a "new legal argument[]" that should not be

---

[5]     In her motion for rehearing, Khalil points to a third letter as evidence of defamatory statements, which is a letter dated December 16, 2014 that is from Memorial Hermann's chief of staff to Khalil. The letter, like the two letters discussed above, is marked "privileged & confidential medical staff peer review committee proceedings & document." Thus, it is subject to the same analysis as the October 14 and December 8 documents.

26

permitted. We disagree for two reasons. First, Memorial Hermann did raise the defense of peer-review privilege in its answer and in its motion to dismiss. Second, Memorial Hermann's motion to dismiss was denied by operation of law, and we review that denial using a de novo standard. A necessary step in our review is to determine whether Khalil established by clear and specific evidence a prima facie case for each essential element of her claim. TEX. CIV. PRAC. & REM. CODE § 27.005(c). In the context of a peer-review-committee action—which a defamation suit based on two peer-review-committee letters would be—one of the elements that must be established by the plaintiff is malice. *See Ubinas-Brache*, 68 S.W.3d at 40; *cf. Sheffield*, 2014 WL 411672, at *6 (holding that malice is part of nonmovant's prima facie defamation proof in evaluating TCPA dismissal in context of labor dispute).

To establish malice, Khalil points to two emails sent to her by Memorial Hermann's peer-review committee. The emails ask Khalil to review and comment on cases that drew additional investigation during the chart audit. Each email states the known facts surrounding Khalil's care of a pediatric patient, lists information from that patient's chart, and identifies medical difficulties encountered. The two emails ask Khalil to provide the committee with her comments on each case.

These emails evidence the type of investigation that is expected of peer-review committees. *See Ching*, 134 S.W.3d at 241 (stating that public policy

encourages hospitals to conduct peer reviews of physicians). They contain no evidence of malice, and they fail to overcome the presumption of no malice on the part of a hospital entity engaging in peer-review activities. *See id.* at 242; *Maewal*, 868 S.W.2d at 893.

Khalil suggests that, even if the emails' content does not establish malice, the timing of the two communications raises an issue of malice because the peer-review committee's emails were sent in September 2015, which was several weeks after she had already been removed from clinical-care duties. We fail to see any evidence of malice in this timing. When, in December 2014, Khalil was removed from clinical care and a corrective action plan was initiated, Khalil agreed to participate in a focused professional practice evaluation as well as a chart audit. In a letter to Khalil dated September 14, 2015, the UT Health associate dean of faculty affairs stated that the chart audit had been completed. That chart audit flagged two patient-care events that occurred in June 2015. Memorial Hermann determined that the two cases required additional review. Just one month later, Memorial Hermann notified Khalil that its quality-review committee would hold a meeting the following month to review the two cases and, in advance of that meeting, sent the two emails to request Khalil's input.

These two emails are evidence of the peer-review committee's efforts to gain Khalil's perspective on two flagged cases. These documents, like the others

28

discussed above, fail to provide clear and specific evidence of malice, an essential

element of a defamation claim based on peer-review communications.[6]

---

[6]     In her petition for rehearing, Khalil points to other documents in the record and argues that viewing those documents in the light most favorable to her requires a conclusion that she has met her burden, including to provide evidence of malice. We disagree.

First, she points to a partial printout of a letter from her to an unspecified recipient, written in late June or early July 2015. In that letter, Khalil first discusses a letter she had recently received giving her final notice that her reappointment packet was due and then she alleges that Memorial Hermann was wrongly holding up her reappointment application. According to Khalil, her letter shows intentional delay of the credentialing process by Memorial Hermann. But the record also contains a letter to Khalil from Memorial Hermann's chief medical officer dated July 15, 2015. This July 15 letter was attached as an exhibit to Khalil's fourth amended petition. Thus, it was her evidence submitted in support of her defamation claim. The July 15 letter assures Khalil that a letter previously sent to her about the status of her credentials was sent in error, did not apply to her, and did not accurately state the status of her recredentialing review. The letter further assures Khalil that she was not, at that time, behind on her application process.

Khalil accurately states that we must view the evidence in the light most favorable to her. *See Cheniere Energy, Inc. v. Lotfi*, 449 S.W.3d 210, 213–14 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (setting forth standard of review). She asserts that we discounted evidence favorable to her, choosing, instead, to credit contrary evidence. But all of the evidence was her evidence, attached to her pleadings. The applicable standard of review does not require that we ignore her evidence that provides context to other evidence on which she complains. The second letter explains that Khalil need not try to interpret the earlier correspondence she received because it was sent to her in error and did not apply to her recredentialing process.

Second, she points to letters by other physicians containing positive remarks about her medical skills. Again, Khalil asserts that we must review these letters in the light most favorable to her and discount other evidence to the contrary. She contends that we failed to do so because we "credited negative findings" about her in Memorial Hermann's competency review over these positive reviews. Again, we disagree. We describe the negative statements in the Memorial Hermann documents only because those documents were the basis for Khalil's assertion that

29

Because Khalil did not meet her burden to avoid dismissal of her defamation claim under the TCPA procedures, the denial of this aspect of Memorial Hermann's dismissal motion was in error. We turn next to Memorial Hermann's efforts to dismiss Khalil's other causes of action.

## 2. Fraud

"A plaintiff seeking to prevail on a fraud claim must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011).

Khalil contends that Memorial Hermann made representations to her that the credentialing process could be completed by the date her credentials were set to expire but intentionally delayed and misrepresented the process to her to allow her credentials to expire. Khalil's position appears to be that Memorial Hermann knew its representations to her during the peer-review and related credentialing process

---

defamatory statements had been made about her. The extent of Khalil's medical skills are not an issue on appeal and we have offered no evaluation of that issue.

30

were false because Memorial Herman never intended to truly consider her for recredentialing.

Khalil's argument asks that we presume bad intentions by Memorial Hermann. Specifically, it asks that we assume that Memorial Hermann knowingly made false representations during its peer-review and credentialing activities. We cannot presume such bad intentions because there is a presumption of good faith that attaches to any "act, statement, determination, or recommendation made, or act reported . . . in the course of medical peer review." TEX. OCC. CODE § 160.010(b); *Ubinas-Brache*, 68 S.W.3d at 39–40 (citing Occupations Code and stating that statute mandates "a threshold standard of malice to state a cause of action against a health care entity for medical peer review actions" and that plaintiff bears burden to establish malice).

Because Khalil failed to offer clear and specific evidence of malice in the context of challenged peer-review actions, her fraud claim fails. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c).

### 3. Tortious interference with UT Health contract

"The elements of a cause of action for tortious interference are (1) the existence of a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's

31

damage and (4) actual damage or loss occurred." *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 939 (Tex. 1991).

In her fourth amended petition, Khalil asserts that Memorial Hermann interfered with her contract with UT Health by disparaging her work performance to UT Health employees and requiring UT Health's department chair to suspend her.

To withstand dismissal under the TCPA procedures, Khalil must establish by clear and specific evidence a prima facie case for each essential element of her tortious interference claim, including damages. TEX. CIV. PRAC. & REM. CODE § 27.005(c); *see Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990) ("The basic measure of actual damages for tortious interference with contract is the same as the measure of damages for breach of the contract interfered with, to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed.").

Clear and specific evidence to support a prima facia case means "the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re Lipsky*, 460 S.W.3d at 590 (internal quotations omitted). Thus, Khalil must proffer at least the minimum quantum of evidence necessary to support a rational inference that Memorial Hermann's interference

with her contract with UT Health proximately caused her damages flowing from that contract.[7]

Khalil concedes that she "is still employed" by UT Health and working under her existing contract, which suggests that she also is continuing to receive compensation due under that contract. She does not allege that her UT Health income has diminished due to the practice restrictions UT Health imposed, nor does she offer any evidence to support such a conclusion. Khalil speculates that her UT Health contract might not be renewed in the future, which could cause future economic losses, but her assertion is speculative and no evidence of actual damages or losses flowing from any interference by Memorial Hermann with her UT Health contract. *See S. Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 324 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (stating that "a party may not recover damages for breach of contract if those damages are remote, contingent, speculative, or conjectural").

With no evidence of economic damages proximately caused by interference with her contract with UT Health, Khalil argues that she has suffered mental-

---

[7]  Memorial Hermann and UT Health are separate entities. Khalil had a contract with each entity and received earnings under each contract. In this claim, she asserts that Memorial Hermann interfered with her UT Health contract and caused her damages under that contract. Thus, the claim is focused on earnings due to Khalil under her UT Health contract. To the extent her earnings under the Memorial Hermann contract were reduced as a result of Memorial Hermann's actions, those losses are distinct from and do not support her interference claim, seeking the damages that flowed from interference with the UT Health contract.

anguish damages. But mental anguish damages are not recoverable in a claim for tortious interference with a contract. *See Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 818 & n.22 (Tex. 2005) (stating that claim for tortious interference with contract does not allow mental anguish damages).

Because Khalil failed to establish by clear and specific evidence a prima facie case for damages, which is an essential element of her tortious interference claim, it was error for the trial court not to dismiss this claim. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c).

### 4. Intentional infliction of emotional distress

"To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004). Whether a defendant's conduct is "extreme and outrageous" is a question of law. *Wornick Co. v. Case*, 856 S.W.2d 732, 734 (Tex. 1993); *Gaspard v. Beadle*, 36 S.W.3d 229, 237 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

Extreme and outrageous conduct is conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community." *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). "Meritorious claims for intentional infliction of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006).

In deciding whether particular conduct rises to an extreme and outrageous level, we consider the context and the relationship between those involved. *GTE Sw. Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex. 1999). Texas courts have adopted a "strict approach" to analyzing claims of intentional infliction of emotional distress in the employer-employee context. *Durckel v. St. Joseph Hosp.*, 78 S.W.3d 576, 586 (Tex. App.—Houston [14th Dist.] 2002, no pet.). The employer's conduct must exceed the scope of an ordinary employment dispute to enter the realm of extreme and outrageous conduct—the sort that would be utterly intolerable in a civilized community. *Id.* "Even the wrongful transfer, failure to promote, or termination of an employee does not, standing alone, constitute intentional infliction of emotional distress." *City of Midland v. O'Bryant*, 18 S.W.3d 209, 217 (Tex. 2000). Nor does a threat to fire someone or "ruin their career." *Louis v. Mobil Chem. Co.*, 254 S.W.3d 602, 609 (Tex. App.—Beaumont 2008, pet. denied) (holding that such threats are part of "ordinary business dispute").

35

Khalil seeks to meet her evidentiary burden to establish by clear and specific evidence a prima facie case for the element of "extreme and outrageous" conduct by pointing to Memorial Hermann's "denying her due process and denying her rights" under the medical-staff bylaws. In essence, she complains that Memorial Hermann wanted to suspend, or possibly terminate, her without the burden of following its bylaws. Even if true, acting in violation of a stated policy does not meet the standard of extreme and outrageous conduct in the context of an employer-employee dispute. *See Beiser v. Tomball Hosp. Auth.*, 902 S.W.2d 721, 723, 725 (Tex. App.—Houston [1st Dist.] 1995, writ denied); *Sebesta v. Kent Elecs. Corp.*, 886 S.W.2d 459, 462–64 (Tex. App.—Houston [1st Dist.] 1994, writ denied). We conclude that Khalil's allegations and evidence suggesting that Memorial Hermann violated its internal policies and procedures, without more, is insufficient to meet her evidentiary burden with respect to the extreme-and-outrageous-conduct element of her claim.

We hold that the trial court erred by not dismissing this claim. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c).

### 5.    "Assisting and encouraging"

Khalil asserts that Memorial Hermann assisted and encouraged UT Health to remove her from clinical practice through a summary suspension without due

process or other rights provided for in Memorial Hermann's bylaws. She asserts this claim as a separate cause of action from the others discussed above.

It is an "open question" whether a tort exists, under Texas law, for "assisting and encouraging." *Juhl v. Airington*, 936 S.W.2d 640, 643 (Tex. 1996). The concept is derived from Section 876 of the Second Restatement of Torts. RESTATEMENT (SECOND) OF TORTS § 876 (1977). Subsection (b) states that liability can be imposed on a person for the conduct of another if the defendant "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *Id.* at § 876(b). The Texas Supreme Court has not recognized "assisting and encouraging" as a viable tort theory but has noted that the theory is meant to deter "highly dangerous, deviant, or anti-social group activity [that is] likely to cause serious injury or death to a person or certain harm to a large number of people," like, for example, group assault and drag racing. *Juhl*, 936 S.W.2d at 644–45; *see Martinez v. Ford Motor Credit Co.*, No. 04-11-00306-CV, 2012 WL 3711347, at *5 (Tex. App.—San Antonio Aug. 29, 2012, pet. denied) (mem. op.) (holding that failure to obtain salvage or nonrepairable title would not meet *Juhl* standard); *W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 921–22 (Tex. App.— Dallas 2014, pet. denied) (concluding that misappropriation of trade secrets fails to meet standard of "highly dangerous, deviant, or anti-social group activity [that is]

likely to cause serious injury or death to a person or certain harm to a large number of people").

Even assuming this is a viable cause of action, the *Juhl* requirement that the activity be "highly dangerous, deviant, or anti-social group activity" is not satisfied with allegations or evidence of coordinated efforts to remove an employee. Accordingly, we conclude that Khalil has not established a prima facie case for this claim, and the trial court erred by not dismissing it.

### 6. Conspiracy

"Civil conspiracy, generally defined as a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means, might be called a derivative tort. That is, a defendant's liability for conspiracy depends on participation in some underlying tort . . . ." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

Khalil argues that Memorial Hermann conspired with UT Health to defraud her and remove her clinical privileges without due process. We have already concluded that Khalil cannot avoid dismissal of her other asserted tort claims. Because conspiracy is dependent on an underlying tort, and none remain, it too is subject to dismissal. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 930–31 (Tex. 2010); *Preston Gate, LP v. Bukaty*, 248 S.W.3d 892,

898 (Tex. App.—Dallas 2008, no pet.). The trial court erred by not dismissing this claim.

We turn next to Khalil's argument that the TCPA is unconstitutional, which, if we were to agree, would require us to affirm the denial of Memorial Hermann's TCPA motion.

## C.    Khalil's constitutional challenge

Khalil challenges the TCPA as unconstitutional, both facially and as applied to her. She asserts that it violates the Open Courts provision of the Texas Constitution found in Article I, Section 15, and denies the guaranteed right of free expression contained in Article I, Section 8.

"Under a facial challenge . . . the challenging party contends that the statute, by its terms, always operates unconstitutionally." *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 (Tex. 1995). A "facial challenge contrasts with an 'as applied' challenge, under which the plaintiff argues that a statute, even though generally constitutional, operates unconstitutionally as to him or her because of the plaintiff's particular circumstances." *Id.* at 518 n.16. "We may not hold the statute facially invalid simply because it may be unconstitutionally applied under hypothetical facts which have not yet arisen." *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 463 (Tex. 1997).

### 1.     Facial challenge

Khalil's facial challenge argues that the TCPA "functions as a prior restraint." She suggests that the constitutional analysis historically given to "prior restraint" cases applies here. We disagree.

"The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993); *see Marketshare Telecom, LLC v. Ericsson, Inc.*, 198 S.W.3d 908, 917 (Tex. App.—Dallas 2006, no pet.). We fail to see how a statute that provides for the dismissal of already-filed claims that are based on already-published speech acts as a prior restraint on speech. *See Guam Greyhound, Inc. v. Brizill*, No. CVA07-021, 2008 WL 4206682, at *7 (Guam Terr. Sept. 11, 2008) (rejecting contention that anti-SLAPP statute acts as prior restraint).

The remainder of Khalil's facial-challenge argument is that the TCPA applies "expedited, draconian procedures"[8] that prevent a plaintiff from conducting

---

[8]     Khalil describes the TCPA's procedures as "draconian," yet she states that the requirement to "establish by clear and specific evidence a prima facie case for each essential element of the claim" is—in her words—"in reality a modest burden." This is because courts consider the parties' pleadings, their supporting affidavits, and any permitted discovery when analyzing a TCPA dismissal motion, and they view these documents in the light most favorable to the nonmovant attempting to avoid dismissal. *See Cheniere Energy*, 449 S.W.3d at 214; *see also In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015) (stating that, although "the TCPA initially demands more information about the underlying [defamation] claim, the

discovery to meet the statute's evidentiary burden and impose mandatory attorney's fees and sanctions that act to deny access to the courts to seek redress for reputational torts.

The challenge to the discovery limitation mirrors one asserted and rejected in *Sheffield*. *See* 2014 WL 411672, at *10 (rejecting open-courts challenge to TCPA's discovery restrictions because, first, provision that stays discovery is tempered by another provision that permits discovery on showing of good cause and, second, curtailing potentially costly discovery in possibly meritless case serves TCPA's goal of keeping litigation from being used to chill exercise of protected rights). We conclude that there is no merit to Khalil's open-courts challenge to the TCPA's discovery restrictions.

We likewise conclude that there is no merit to Khalil's challenge to the TCPA's fee-award provision, which states that upon dismissal of a legal action under the TCPA, "the court shall award to the moving party . . . court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require" as well as "sanctions . . . as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter." TEX. CIV. PRAC. & REM. CODE

---

Act does not . . . impose a higher burden of proof than that required of the plaintiff at trial.").

41

ANN. § 27.009(a). To prevail on an open-courts challenge, Khalil must show that a cognizable common-law cause of action is being restricted and that the restriction is unreasonable or arbitrary when balanced with the statute's purpose and basis. *Sheffield*, 2014 WL 411672, at *9. The issue here is whether a mandatory fee award is unreasonable or arbitrary given the TCPA's purpose.

The TCPA's express purpose is to balance protections for persons exercising their constitutional rights of expression and association with protections for persons filing meritorious lawsuits for demonstrable injury. TEX. CIV. PRAC. & REM. CODE ANN. § 27.002. Khalil describes the fee-award provision as a barrier to a party's right to "seek to utilize their right to petition to protect their reputations." We disagree.

The fee-award provision is not imposed on a party before being permitted to institute litigation. Nor is it imposed on parties who meet the burden placed on them, under the TCPA, of establishing by "clear and specific evidence" the elements of their prima facie case so as to avoid dismissal. *Id.* § 27.005(c). Instead, it is a fee imposed after resolution of a motion to dismiss that shifts litigation costs from the prevailing party (who met its burden to show by a preponderance of the evidence that the legal action is based on, related to, or is in response to that party's exercise of protected rights) to the party that failed to meet its burden. *See*

*id.* § 27.005(b). Section 27.009 does not act as an impermissible pay-to-play barrier to the courts; it shifts litigation costs after resolution of a claim.

There are provisions in place that limit the impact of this fee-shifting provision. A TCPA motion to dismiss must be filed within 60 days of the date of service of the legal action, absent a showing of good cause for a later filing. *See id.* § 27.003(b). This temporal limitation has the effect of limiting the amount of attorney's fees that could be incurred by a party seeking dismissal of a claim and, in turn, imposed on a party subject to the TCPA's summary-dismissal procedures. Additionally, the TCPA provides trial courts with discretion to determine a "reasonable" amount of attorney's fees to award as well as the amount of sanctions that would be sufficient to deter repeated, similar filings. *See id.* § 27.009(a). Moreover, the TCPA includes a countermeasure that permits fee-shifting in the event a trial court finds that a motion to dismiss was frivolous or filed solely to delay. *See id.* § 27.009(b).

Given these measures that limit the duration of fee accumulation and therefore the amount of fees that might be imposed on a party under the TCPA, provide the trial court with discretion in determining fee and sanction awards, and establish a mechanism to shift fees to those who would abuse the TCPA procedures, we conclude that the fee-award provision is not unreasonable or arbitrary when balanced with the statute's purpose and does not violate the open-

courts doctrine. *Cf. Guillory v. Seaton, LLC*, 470 S.W.3d 237, 244–45 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (reaching similar conclusion in open-courts challenge to fee-shifting mechanism in Rule 91a of Texas Rules of Civil Procedure).[9]

We conclude that there is no merit to Khalil's challenge that the TCPA is facially unconstitutional.

---

[9] Khalil's brief highlights that these dismissal procedures are being implemented against "reputational tort" claims and suggests that such claims are entitled to a more exacting analysis than has been applied in other open-courts challenges because the Texas Constitution protects one's right to sue for reputational torts. *See* TEX. CONST. art. I, § 8. While this constitutional provision protects the right to seek damages for defamatory speech, it also protects the constitutional right to that speech. *See Neely v. Wilson*, 418 S.W.3d 52, 60 (Tex. 2013). The law strives to balance these constitutionally protected interests. *See id.*; *see also Cain v. Hearst Corp.*, 878 S.W.2d 577, 582 (Tex. 1994) (noting "numerous procedural and substantive hurdles" to actions for defamation under Texas law). The TCPA expresses a similar purpose, to balance protection of a person's right to file meritorious lawsuits with protection of others' constitutional rights to speak freely. *See* TEX. CIV. PRAC. & REM. CODE § 27.002. As such, movants invoke the TCPA to obtain summary dismissal of retaliatory lawsuits that seek to silence their speech. *See In re Lipsky*, 460 S.W.3d at 586. Given the scope of the TCPA, these lawsuits are often pleaded as reputational torts. *See, e.g.*, *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (involving party seeking TCPA dismissal of defamation claim); *In re Lipsky*, 460 S.W.3d at 579 (same). At oral argument, Khalil conceded the lack of constitutional case law supporting her argument for a more exacting analysis of her open-courts challenge to the dismissal of reputational torts. And we fail to see how an open-courts challenge to a dismissal statute that involves shifting burdens of proof, places on the nonmovant the burden to establish by clear and specific evidence a prima facie case for each essential element of her claims to avoid dismissal, but also provides a mechanism to obtain discovery, if shown to be warranted, to obtain additional evidence to meet that burden would be analyzed with a different constitutional rigor in the context of a reputational tort versus any other claim.

## 2. "As applied" challenge

Khalil's "as applied" argument mirrors her facial-challenge argument. She provides no additional argument how this statute, if facially valid, is, nevertheless, unconstitutional as applied to her particular claims. By failing to adequately brief this assertion, she has waived it. *See* TEX. R. APP. P. 38.1(i).

## D. Conclusion on Memorial Hermann's motion to dismiss

Memorial Hermann met its initial burden to establish by a preponderance of the evidence that Khalil's legal action is based on, relates to, or is in response to its exercise of the right of free speech, as defined in the TCPA. Khalil failed to meet her burden to establish by clear and specific evidence a prima facie case for each essential element of her claims challenged in Memorial Hermann's motion to dismiss. Accordingly, we sustain Memorial Hermann's first issue and conclude that the denial of Memorial Hermann's dismissal motion must be reversed. Because this resolution grants Memorial Hermann the relief it seeks—dismissal of Khalil's challenged claims—Memorial Hermann's second issue, which seeks the same disposition, is moot.

We turn now to Khalil's appeal of the denial of her TCPA motion to dismiss, through which she sought dismissal of Memorial Hermann's TCPA motion.

**Khalil's Motion to Dismiss Memorial Hermann's Motion**

In Khalil's cross-appeal, she argues that the trial court erred by denying her motion to dismiss. Whether a party may seek Chapter 27 dismissal of a Chapter 27 motion to dismiss involves construction of a statute, which courts review de novo. *See R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). Khalil cannot use the TCPA to seek dismissal of Memorial Hermann's dismissal motion,[10] but even if she could, our analysis of the issues in the context of the TCPA's shifting burdens of proof would lead us to conclude that Memorial Hermann has met its burden to avoid dismissal of its legal action. Memorial Hermann's legal action—its TCPA motion to dismiss—sought the dismissal of Khalil's claims. We have concluded that the motion had merit in that Memorial Hermann met its burden while Khalil did not meet hers to avoid dismissal. Because Memorial Hermann has met the prima-facie standard, the burden of proof shifts back to Khalil to establish a defense. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d). The only defense Khalil raises is that the statute is unconstitutional. We have rejected that argument.

Finding no error in the denial of Khalil's motion to dismiss and no merit to her constitutional argument, we overrule her cross-appeal.

---

[10]  *See Paulsen v. Yarrell*, No. 01-16-00061-CV, 2017 WL 2289129, at *5–8 (Tex. App.—Houston [1st Dist.] May 25, 2017, no pet. h.).

## Conclusion

We hold that Memorial Hermann satisfied its burden under the TCPA to obtain dismissal of each of Khalil's claims challenged by its motion. We therefore reverse the denial of Memorial Hermann's TCPA dismissal motion. With regard to Khalil's dismissal motion, we conclude that there was no error in its denial.

Accordingly, we remand the case to the trial court to dismiss Khalil's claims that were the subject of Memorial Hermann's motion—defamation, fraud, tortious interference, intentional infliction of emotional distress, "assisting and encouraging," and conspiracy; to determine any amounts that will be awarded to Memorial Hermann because it prevailed on its dismissal motion; and for further proceedings on Khalil's remaining claims, including her age-discrimination claim.


Harvey Brown
Justice

Panel consists of Justices Massengale and Brown.[11]

---

[11] When this appeal was originally decided, the panel consisted of Justices Massengale, Brown, and Huddle. Justice Huddle left the court while Khalil's motion for rehearing was pending. The Texas Rules of Appellate Procedure allow for a decision by the two remaining justices "if for any reason a member of the panel cannot participate in deciding a case." TEX. R. APP. P. 41.1(b); *cf. id.* 49.3 ("A motion for rehearing may be granted by a majority of the justices who participated in the decision of the case. Otherwise, it must be denied.").